# In The United States District Court
# For the District of Massachusetts

WILLIAM YEAGER
206 State St. Cottonwood Falls,
KS. 66845

--------------------

### PLAINTIFF

### V.

WBUR 90.9 Boston NPR PUBLIC RADIO
890 Commonwealth Avenue
Boston, Massachusetts 02215


NPR
NATIONAL PUBLIC RADIO
1111 North Capitol Street, NE,
Washington, DC 20002

--------------------

### DEFENDANTS

**COMPLAINT
JURY TRIAL DEMANDED**


CIVIL ACTION NO.   _____

**NATURE OF THE CASE**

1. The plaintiff brings this action challenging the false defamatory statements that were published by **NPR** and republished by **WBUR-FM** (90.9 FM); the false defamatory statements that were broadcasted by NPR on *All Things Considered*; and the false light in which the article and broadcast painted the Plaintiff. These false statements were written with extreme negligence and actual malice. (Not only were these false defamatory statements published and broadcasted with a high degree of negligence, and without using reasonable care to determine the truth or falsity of them, but with knowledge that what was being stated was false and would damage the plaintiff.) NPR's defamatory statements were republished and broadcasted again by WBUR-FM (90.9 FM) is a public radio station located in Boston, Massachusetts, owned by Boston University. WBUR is the largest of three NPR member stations in Boston, along with WGBH and WUMB-FM.

2. NPR is liable for the republication of these defamatory statements published and broadcasted by WBUR because it was reasonable foreseeable. See Shively v. Bozanich, 80 P.3d 676, 683 (2003) ("repetition by a new party of another person's earlier defamatory remark also gives rise to a separate cause of action for defamation against the original defamer, when the repetition was reasonably foreseeable").

3. It is impossible for the defendants to claim they could not have reasonably foreseen republication of their statements because NPR serves as a national syndicator to a network of over 1,000 public radio stations in the United States.

4. There is no sufficient evidence for the Court to conclude republication was not reasonably foreseeable as a matter of law. A genuine issue of material fact persists as to the reasonable

foreseeability of the republication of the contents of NPR's article and broadcast. Summary judgment is therefore inappropriate, and the question must be presented to the jury.

## JURISDICTION AND VENUE

5. Jurisdiction and venue is proper as set forth in the long arm statute of Massachusetts (M.G.L. c. 223A, §§ 1 through 11.)  The cause of action arise from the defendants activity within the state on NPR's affiliate station WBUR 90.9  A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a (cause of action) (claim for relief) arising from the person's: (a) transacting business in the state of Massachusetts . Nation Public Radio transmits, broadcasts and publishes  its "news" across the United States, the defendants knew that harm would be felt in Massachusetts.  Any person who lives in Massachusetts, or any organization that's established under Massachusetts laws or that maintains a primary place of business in Massachusetts, may be sued in Massachusetts. See M.G.L. c. 223A, § 2. In certain circumstances, the court divisions of the BMC may also have personal jurisdiction over a defendant who lives or works outside of the state.

## PARTIES / BACKGROUND OF THE CASE

6. The petitioner William "Billy" Yeager is a songwriter / musician, independent filmmaker, humanitarian and media activist. National Public Radio (NPR, stylized as npr) is an American privately and publicly funded non-profit membership media organization based in Washington, D.C. NPR differs from other non-profit membership media organizations, such as AP, in that it was established by an act of Congress [2] and most of its member stations are owned by government entities (often public universities). It serves as a national syndicator to a

network of over 1,000 public radio stations in the United States.

7. NPR states, *"Public service should be the goal of any journalist, but it has special meaning for us, because we call ourselves 'public media.' Listeners consider public radio an enriching and enlightening companion; they trust NPR as a daily source of unbiased independent news, and inspiring insights on life and the arts."*

8. In January 2017, a test pressing of a record album called *301 Jackson St*. (recorded by Billy Yeager in 1989) was sold on Discogs (a website to buy and sell vinyl records) becoming the most expensive record sold on this website.

9. Over 2 months later, on March 22, 2017, Discogs sent a press release to NPR to share the news about the sale of the album. The following day, on March 23, at 4 am in the morning, Discogs cancelled the transaction because they believed it to be fraudulent.

10. Six (6) hours later (without making a single attempt to inform the petitioner about the breaking news they were getting ready to publish against him (which represents a violation of NPR's Codes of Rules, Standards and Ethics)), NPR broke the news; at 9:48 AM ET (on March 23) NPR published a 'music news article,' written by a reporter, not an 'opinion column,' written by an opinion columnist.

11. In the publication of their "news article," NPR violated their standards and the standards of the American Society of Professional Journalists to an unfathomable high degree.

12. Some of the standards that must be followed when reporting the news but in this case were

violated by NPR include:

**Objectivity** in reporting the news… serves as the mark of an experienced professional. Sound practice makes **clear distinction** between **news reports** and **expressions of opinion**. **News reports** should be **free of opinion or bias and represent all sides of an issue.** Journalists at all times will show **respect for the dignity, privacy, rights, and well-being of people** encountered in the course of gathering and presenting the news. The news media **should not communicate unofficial charges affecting reputation or moral character without giving the accused a chance to reply.** The media should not pander to morbid curiosity about details of vice and crime. **It is the duty of news media to make prompt and complete correction of their errors.** Journalists should be **accountable to the public** for their reports and the public should be encouraged to voice its grievances against the media.

13. Important fact: No charge (neither unofficial nor official) was ever made against the petitioner; Discogs never accused the petitioner.

14. National Public Radio's CODE: *"Accurate" means that each day we make **rigorous efforts** at all levels of the **news gathering and programming process** to ensure our facts are not only accurate but also presented in the correct context. We make **every possible effort** to ensure assertions of fact in **commentaries**, including facts implied as the basis for an opinion, are correct. We **attempt to verify** what our sources and the officials we interview tell us when the material involved is argumentative or open to different interpretations. We are skeptical of all facts gathered and report them **only** when we are reasonably satisfied of their accuracy. **We guard against errors of omission that cause a story to misinform our listeners by failing to be complete. We make sure that our language** accurately describes the facts and **does not***

*imply a fact we have not confirmed,* and quotations are both accurate and placed properly in context. *Take special care with news that might* **cause grief or damage reputations.**

15. Important fact: Discogs stated there was a buyer and a seller in **two different states** and with two different IP addresses; this information was omitted by NPR (it was neither published nor broadcasted.)

16. The day following the publication of the news article, on March 24, NPR continued to spread the same defamatory accusations and malicious falsehoods on their radio show "All Things Considered," which is the flagship news program on the American network National Public Radio; again, the petitioner was not contacted and offered the opportunity to reply and defend himself against the attacks on his character and reputation; there was no *"effort"* or *"attempt"* to *"ensure"* or to *"verify"* made.

17. NPR's CODE: **We make every effort to gather responses from those who are the subjects of criticism, unfavorable allegations or other negative assertions in our stories. In all our stories, especially matters of controversy, we strive to consider the strongest arguments we can find on all sides.** *When a person or company has been charged with wrongdoing by official sources, we must carefully avoid presenting facts in a manner that presumes guilt.* (NPR's journalists *"must"* be careful even when a person has been officially charged; the petitioner had not even been accused.) *If the subject of the story doesn't know what you're going to report, how can we be fair to them? When news is breaking, make sure the people we're attempting to reach know about our deadlines — for the next newscast and the next program, for example. Look for proxies who may be able to defend their side.*

*18. NPR journalists with a role in reporting and producing the news do not deliver commentaries…do not opine on matters we cover in the news…the public deserves factual reporting…without our opinions influencing what they hear or see.*

19. The lack of reasonable care and extreme degree of negligence exercised by NPR's journalists and their superiors was extreme.

20. Both the article and the radio broadcast were completely biased against the plaintiff and contained numerous defamatory false statements that were made with actual malice; all the disclosed facts to support what the court considers 'statements of opinion' were also made with actual malice; the disclosed facts were misrepresented to the audience, taken out of context, information that was crucial for their understanding was omitted, and in consequence what the public received was a complete distortion of the truth.

21. Overall, both the article and the radio broadcast described the petitioner as a corrupt individual that had attempted to perpetrate a fraudulent sale because of his "hunger for fame, or infamy." The news article stated 3 times that the petitioner was motivated by "infamy." The radio broadcast, again, repeated that the petitioner was interested in "infamy." Definition of infamy: noun: **infamy**; plural noun: **infamies** an evil or wicked act. the state of being well known for some bad quality or deed.

22. 100% of comments from NPR's readers and listeners were extremely offensive, insulting, contemptuous; the petitioner was even compared to Charles Manson.

23. NPR's CODE states: *Be judicious when passing along breaking news. When news is breaking,*

*we may need to pass along information reported by others because the public should know about it immediately.* **This is particularly true when safety is an issue (*severe weather events* or other types of *emergencies*, for example).**

*24. And again, if we have information that might cause significant grief or might potentially put someone in harm's way, we do not report it until it's been thoroughly verified and senior editors have given their approval. Few in our audience will know or care which news organization was first to report a breaking news story. But if we get it wrong, we leave a lasting mark on our reputation.*

***25. Any falsehoods in our news reports can cause harm. But errors that may damage reputations or bring about grief are especially dangerous, and extra precautions should be taken to avoid them.*** *In those cases, err on the side of caution. Go* **slowly**, *and* **above all, get clearance from a senior manager.**

26. The accusations National Public Radio published and broadcasted against the petitioner were published in a matter of hours even though there wasn't even an unofficial charge, and there was no evidence to sustain the accusation — Discogs stated that the seller and the buyer were located in two different states; this information indicated the contrary to what NPR reported.

27. Again, NPR never attempted to give the petitioner the chance to reply and defend himself; the petitioner was never informed about the breaking news; never contacted after the publication of the news; never contacted to be invited to the broadcast; never contacted afterwards.

28. Three (3) months later, the petitioner himself contacted NPR's in-house legal counsel Ashley

Messenger to ask for the removal of NPR's article and broadcast, which not only accused the petitioner of committing a dishonest action, but defamed his character, his career, his work and went as far as declaring the petitioner's life as *"one of purposeless obfuscation"* and stating the petitioner was interested in *"infamy"* and *"the chase of pulling the wool over people's eyes"* and had *"repeatedly poured more of his creative energy into being a trickster-booster than he has as an artist."*

29. After careful examination of the article and broadcast, and after talking to the responsible parties, Ashley Messenger got back in contact with the petitioner. As an experienced media law attorney, if Messenger had thought that NPR had done nothing that could cause liability she would have said so; that was not the case. Messenger began asking the petitioner if **he could provide NPR with the names of the seller and the buyer**, because NPR did not have this information, meaning that she admitted that NPR had published and broadcasted a defamatory accusation of fact without proof.

30. The petitioner replied, "weren't you supposed to know?" Already under severe depression and emotional distress, NPR's attitude did not set well with the petitioner; there was no genuine emotion of concern for what NPR had unjustly and wrongly done to a human being.

31. The petitioner began to send Ashley Messenger the same information that had been seen by NPR's journalists prior to the publication of the article and broadcast; NPR removed the article from NPR's website; the petitioner informed NPR that the removal of the article would not be enough to compensate for all the damage done; NPR put the article back on their website.

32. Messenger remained in communications with the petitioner and his wife **for 3 weeks about**

**the matter** (until the petitioner decided to file his lawsuit); she stated in an e-mail "*we are taking this very seriously.*" The petitioner refused to answer questions regarding issues that should have been investigated and asked prior to the story and broadcast that was shared all over the world to millions of people destroying the reputation and work of the petitioner.

33. After all the harm that had been done (not just to the petitioner, but his wife, and others), complete lack of due care and abandonment of their codes, the petitioner was not going to accept some corrections and a retraction of the article (what about the millions of people that heard the radio-broadcast?).

34. (The plaintiff wanted the removal of the defamatory story and broadcast, a true apology, a public statement to the audience explaining what NPR had done wrong, a new article and broadcast telling the truth about his and his wife's work and mission and benefit concerts, and recompense for damages to his work and health. NPR never showed the least empathy or compassion; their behavior showed they were primarily concerned about protecting themselves, their reputation, and their money.)

35. The plaintiff continued to send much more of the same facts that were ignored by those who were responsible for the article and the broadcast; including a video (over an hour in length) showing footage that revealed the truth of the petitioner and his wife's work and people giving testimony of what they had felt watching their films and videos; Messenger informed the plaintiff that she brought the members of the corporate team and board of directors together to watch it.

36. During the year 2016, the petitioner and his wife, together with many others, had been preparing a series of benefit concerts (in an underground missile base in KS) to provide wheel

chairs to landmine victims in third world countries where there are still many people who can't afford a wheel chair. This information which was located in the petitioner and his wife's websites was also sent to Messenger who shared it with NPR's corporate team and the board of directors.

37. NPR was also informed that due to their article and broadcast the concerts had been destroyed.

38. The owner of the missile base heard NPR's broadcast and he stated to the petitioner that NPR was saying *"very bad things about you…That you were a huckster and a charlatan…"* Not only National Public Radio didn't inform the public about the benefit concerts, but due to NPR's accusations the owner of the missile base wanted to permanently cancel the concerts.
After reviewing all the evidence, although NPR's corporate team were well aware of the seriousness of the violations committed by NPR against the plaintiff, they pretended as though NPR had done nothing that serious, stating NPR had *"misunderstood"*…
*"Misunderstood"* was not just an insult after all the damages; *"misunderstood"* was not simply a misnomer, but a soft persuasive manipulation of words that underneath imply a total admission of guilt; "mistakes" and "misunderstandings" in this case mean "false defamatory allegations," "extreme negligence," and "malice."

39. In the same e-mail, NPR (instead of removing the article and the broadcast) offered the plaintiff to "write his own story" (which represents a complete violation of NPR's CODE of rules and ethics), on a "condition" however.  Messenger wrote, *"We think our audience would be best served by having you say for yourself what your purpose has been.*
*You may write up to 1500 words in a response that addresses what you would like the public to know about your career, your motives, your desire to change the world.*

*I hope you'll take us up on this offer to allow you to communicate your vision to our audience. If you like, I can arrange to have one of our top editors work with you on crafting a response that will cover what you want to say.*

*To be clear, NPR is not promising to publish it; **we will decline** to do so **if we believe it would not serve our audience or might create liability.** Given our communications, however, I would expect that y**ou can articulate your highest ideals and your artistic vision."***

40. After accusing the plaintiff of being a fraud to millions of people; after painting the plaintiff in a most negative false light; after summarizing his whole life as one of *"purposeless obfuscation,"* and stating he is motivated by *"fame and infamy,"* they ask him to talk about his *"career,"* his *"motives,"* his *"desire to change the world,"* when all this information was in the petitioner and his wife's websites; why is the petitioner being asked to do the job that NPR's professional journalists were supposed to do?

41. It is obvious why NPR offered the petitioner to write his own story (something never heard of, which is not in accordance with their rules); this would have protected themselves from any liability; if NPR had written a different story that contradicted their original story themselves, they (and their Ombudsman) would have had to admit fault to their audience for their extreme negligence and for publishing and broadcasting false and defamatory information **that destroyed an American citizen's life.**

(NOTE: *This is another violation of their code of ethics.* "*In 2000, NPR became the first U.S. broadcast news organization to create an Ombudsman.*" "*The Ombudsman's office serves*

*primarily as a liaison between the newsroom and listeners*." "*We read over 100 of these emails per day*." "*Listeners raise ethical issues and question NPR's adherence to its journalistic standards*." "*We investigate listener concerns and issues of journalism ethics and occasionally suggest changes*.")

## ESTABLISHING THE STATUS OF THE PLAINTIFF

42. Though some proof of fault is required, states are generally free to define the appropriate standard of liability for defamatory falsehoods related to private individuals even if the statements relate to a matter of public interest *(Gertz,* 418 US at 347). The United States Constitution, however, mandates more latitude for false statements related to public figures who are less vulnerable because they "usually enjoy significantly greater access to the channels of communication" and "have a more realistic opportunity to counteract false statements than private individuals normally enjoy" *(id*. at 344; *see Kipper v NYP Holdings Co., Inc.,* 12 NY3d 348, 355 [2009] [falsehoods related to public figures are "inevitable in free debate" so publishers must have "breathing space"]). To recover for defamation, a public figure must not only establish that false statements were made, but must also prove, by clear and convincing evidence, that they were communicated with "actual malice"--that is knowledge or reckless disregard of their falsity *(Kipper,* 12 NY3d at 353, citing *New York Times Co. v Sullivan,* 376 US 254, 279- 80 [1964]).

**Evidence in this case proves the plaintiff is a private figure.**

**Introduction:**

43. Public figures are those who have "assumed roles of especial prominence in the affairs of society" *(Gertz,* 418 US at 345). Few people attain "positions of such pervasive power and influence that they are deemed public figures for all purposes" *(id.; see Waldbaum v Fairchild*

*Publications, Inc.*, 627 F2d 1287, 1292 [DC Cir 1980], *cert. denied* 449 US 898 [1980]). More commonly "those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved" (Gertz, 418 US at 345).

44. From the opinion written by Judge Jennifer G. Schecter, J. in the Supreme Court of the State of New York County of New York in the case Lukasz Gottw Ald v. Kesha Rose Sebert:

*Kesha urges that Gottwald is a public figure and can only recover for defamation if statements asserting that he drugged, raped and sexually assaulted her were made with actual malice. Gottwald certainly is not a "general public figure."* **Although he may be well known in music-industry circles, he has never been a household name or achieved general pervasive fame and notoriety in the community** *(Gertz, 418 US at 351-52; Waldbaum, 627 F2d a~ 306).*

*Nor is he a limited-purpose public figure.* **A person is a limited-purpose public figure "regarding a particular issue or subject when he or she voluntarily injects him or herself into a public controversy with a view toward influencing it"** *(Krauss v Globe Intl., Inc., 251 AD2d 191, 192 [1st Dept· 1998]). Gottwald* **did not thrust himself into the vortex of the public issues or engage the public's attention on the important public matters implicated by the defamatory statements** *(see Time, Inc. v Firestone, 424 US 448, 454-55 [1976] [public controversy alone insufficient; plaintiff must assume "special prominence" in resolution of "public questions"]; see also Gubarev v Buzzfeed, Inc., 354 F Supp 3d 1317, 1328 [SD Fla 2018] ["Plaintiffs must be more than 'tangential participants' in the controversy; they must have achieved 'special prominence' in it" and "either '(1) must purposely try to influence the outcome of the public controversy, or (2) could realistically have been expected, because of (their) position in the controversy, to have an impact on its resolution'"], citing Waldbaum, 627 F2d 1297; contrast Kipper, 12 NY3d at 353 n 3 [in action related to statements about his medical license, plaintiff was a public figure due to, among other things, "his more than 100 television appearances as a medical expert"]; Maule v NYM Corp., 54 NY2d 880, 882-83 [1981]*

*[plaintiff, who projected his name and personality before millions of readers and viewers "to establish his reputation as a leading authority on professional football," was a public-figure defamation plaintiff as to statements denigrating his professional abilities]; James v Gannett Co., 40 NY2d 415, 423 [1976] ["plaintiff welcomed publicity regarding her performances, and therefore, must be held to be a public figure with respect to newspaper accounts of those performances"]; Farber v Jefferys, 103 AD3d 514, 515 [1st Dept 2013] [plaintiff, through publication of "countless articles" on whether HIV causes AIDS, projected her name and personality to establish herself as a "leading authority" and was a limited public figure with respect to statements discrediting her research]; Park v Capital Cities Communications, 181AD2d192 [4th Dept 1992] [physician who invited favorable publicity for practice by appearing on television to discuss medical procedures was a public-figure plaintiff in defamation action related to broadcast about whether he performed unnecessary surgery]; Waldbaum, 627 F2d at 313-14 [status as "an executive within a prominent and influential company does not by itself make one a public figure;"plaintiffs role as an activist in public controversy "concerning unit pricing, open dating, the cooperative form ofbusiness and other issues" rendered him a limited public figure in action related to statement about whether his business lost money and was retrenching]).*

*Though Gottwald has sought publicity for his label, his music and his artists--none of which are the subject of the defamation here--he never injected himself into the public debate about sexual assault or abuse of artists in the entertainment industry.[4] **The only reason Gottwald has any public connection to the issues raised in this lawsuit is because they were raised in this lawsuit.** That cannot convert him into a limited public figure (see Krauss, 251 AD2d at 192-193; Waldbaum, 627 F2d at 1295 n 19 [public figure inquiry focuses on plaintiff before defamation was published **otherwise "press could convert a private individual into a general public figure simply by publicizing the defamation itself and creating a controversy surrounding it"**]; Hutchinson v Proxmire, 443 US 111, 135 [1979] [defamation defendants "cannot, by their own conduct, create their own defense by making the claimant a public figure"]). Because Gottwald is not a public figure for purposes of determining the constitutional protection afforded to statements by Kesha that he drugged, raped and sexually assaulted her (Time, Inc., 424 US at 455), the actual-malice standard is inapplicable.*

45. The plaintiff is an unknown musician and independent filmmaker (NPR stated: *"Nobody's ever heard of this guy."*). The plaintiff never "voluntarily injected himself…", "thrust himself…", or "engaged the public's attention…".

46. The only reason the plaintiff has any public connection to the issues raised in this lawsuit is because they were raised in this lawsuit.

47. The press can't convert a private individual into a general public figure simply by publicizing the defamation itself and creating a controversy surrounding it.

48. Because the plaintiff is not a public figure for purposes of determining the constitutional protection afforded to statements by NPR that he is a fraud, charlatan, huckster, guilty of committing a fraudulent sale, interested in infamy and deceiving people, and that his life has no purpose (Time, Inc., 424 US at 455), the actual-malice standard is inapplicable.

**49. Brown v. Kelly Broad. Co., P.2d 406, 425 (Cal. 1989) ("We decline to diverge from the near unanimous authority that a private person need prove only negligence (rather than malice) to recover for defamation."). That question is for the jury.**
**Argument (including Supreme Court Precedent and Past Legal Decisions) that proves that the plaintiff is a private figure.**

50. The sale of the *301 Jackson St.* record album happened in January 2017, and it is a FACT that the plaintiff never invited (or tried to invite) any public attention.

51. Over 2 months later (the fact that the news was reported 2 months later proves that the sale was never a matter of public concern), Discogs sent a press release to several media outlets covering music news informing them about the sale, but the following day Discogs cancelled the transaction because they believed it to be fraudulent.

52. Discogs did not accuse the plaintiff; Discogs stated there was a buyer and a seller located in 2 different states (the seller and the buyer of the album are willing to testify in court and present the record album as evidence.)

53. **Six (6) hours after Discogs sent their press release, NPR broke the news. It was NPR who thrust the plaintiff into the controversy** by falsely accusing him without proof of being the perpetrator of the fraudulent sale.

54. Plaintiff did not participate in the controversy. **The plaintiff was never informed by NPR about the breaking news (the subject of the litigation (the defamatory article and the radio broadcast) happened overnight).** The plaintiff was given no chance (neither before nor after the breaking news) to defend himself.

55. The United States District Court, S.D. New York stated: Mitre Sports Int'l Ltd. v. Home Box Office, Inc. 22 F.Supp.3d 240 "balls made for Mitre are being stitched together by children in Pakistan—fall short of meeting the requirements for a limited purpose public figure under *Gertz* and the line of cases that consistently require "affirmative steps," "purposeful activity," "voluntary" injection, or "invit[ing] public attention." *See James,* 40 N.Y.2d at 423, 386 N.Y.S.2d 871, 353 N.E.2d 834; *Lerman,* 745 F.2d at 136–37; *Contemporary Mission,* 842 F.2d at 617; *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583, 588–89 (1st Cir.1980).

56. Finally, Mitre's purported role in the international effort to eliminate child labor in the manufacture of soccer balls similarly lack the level of involvement required by *Gertz, James,* and their progeny."

57. The fact that the petitioner recorded the record album *301 Jackson St.* (not on a Major Record Company label - only 4 copies of test pressings were made) over 29 years ago doesn't make him a limited- purpose public figure.

58. Again, the Plaintiff was *"thrust"* into the "matter of public concern" by NPR, and the plaintiff's participation in this matter was zero.

59. Considering the precedent set by Gertz, in the opinion of the majority, written by Justice Powell, he rejected the idea that the mere public interest of the subject should outweigh any consideration of Gertz's status as a private or public figure (3). The latter, he noted, have access to more ways of counteracting allegations about them than private figures do, and thus they deserved a higher standard to prove libel. He also highly doubted that one could involuntarily become a public figure.

60. Considering the mandatory precedent established by *Gertz,* if the plaintiff **didn't thrust himself** into the "matter of public concern," and **there was no participation from him** in the matter, and **he had no access to any media platform** to defend himself, these key factors should be considered before deciding to unload the insurmountable odds to overcome (even for a public figure such as a politician, celebrity or business leader) onto the everyday person who has no power or influence.

61. (By being considered a limited-purpose public figure a plaintiff loses his chance not only to recover damages but of having a trial of any kind to let the truth be known and vindicate his reputation absent a showing of actual malice.)

(3) The United States court of appeals for the third circuit stated: "To determine whether Marcone was a limited purpose public figure with regard to his alleged involvement in the purchase and sale of illicit drugs, we must consider (1) whether drug trafficking is a "public controversy" and (2) the "nature and extent" of Marcone's participation in this controversy. See id.; Avins v. White, 627 F.2d 637, 647 (3d Cir.), cert. denied, 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980)." (Even in a case of a sale of illicit drugs, the court of appeals for the 3d Cir. did not consider just the one factor of "an event of great concern" to determine whether Marcone was a limited-purpose figure. The record sale certainly was not an event of greater concern than the sale of illicit drugs.)

62. To be a limited purpose public figure, the plaintiff must voluntarily thrust himself into the vortex of the dispute. From the voluntary act is derived the notion of assumption of the risk and the consequent fairness in labeling the person a public figure. In the typical limited purpose public figure case, the plaintiff actively participates in the public issue in a manner intended to obtain attention.

63. An agent who holds news conferences to attract media attention for himself and his client is a public figure in that context. Woy v. Turner, 573 F. Supp. 35 (N.D.Ga. 1983).

64. The public figure status of a person in a libel case is to be determined by focusing on the

*"nature and extent of an individual's participation in the controversy giving rise to the [alleged] defamation."* 443 U.S. at 167 (citing Gertz).

65. In *Gertz v. Robert Welch, Inc (*1974*),* the U.S. Supreme Court determined that the plaintiff, a lawyer tangentially involved in the prosecution of a policeman, was not a *limited* purpose *public figure* in connection with the controversy surrounding the prosecution because he had not "*thrust* himself into the vortex of [a] *public* issue, nor *did* he engage the public's attention in an attempt to influence its outcome." 418 U.S. at 352, 94 S.Ct. 2997.

*"For these reasons, we conclude that the States should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual,"* Justice Powell said.

66. As articulated by the Second Circuit, a *limited* purpose *public figure* is someone who has: (i) successfully invited *public* attention to his views in an effort to influence others prior to the incident that is the subject of the litigation (ii) voluntarily injected himself into a *public* controversy related to the subject of the litigation; (iii) assumed a position of prominence in the *public* controversy; and (iv) maintained regular and continuing access to the media. *Contemporary Mission, Inc. v. New York Times Co.,* 842 F.2d 612, 617 (2d Cir.1988), *citing Lerman v. Flynt Distrib. Co., Inc.,* 745 F.2d 123, 136–37 (2d Cir.1984).

Voluntary attention- seeking, or voluntary participation in a particular controversy is a key factor in determining *limited public figure* status. *See James,* 40 N.Y.2d at 423–24, 386 N.Y.S.2d 871, 353 N.E.2d 834.

67. The plaintiff did not *"thrust himself into the vortex of [a] public issue, nor did he engage the public's attention in an attempt to influence its outcome,"* nor did he *"voluntarily injected himself*

*into a public controversy related to the subject of the litigation,"* nor did he *"maintained regular and continuing access to the media" (1).*

68. **Therefore, the plaintiff,** an unknown musician and independent filmmaker (NPR stated: *"Nobody's ever heard of this guy."*), **cannot be considered a *limited* purpose *public figure* in connection with a matter of public concern (2), because he had no participation in the matter other than recording the album in 1989 and he fails to meet the requirements for a *limited* purpose *public figure* under *Gertz* and the line of cases that consistently require "affirmative steps," "purposeful activity," "voluntary" injection, or "invit[ing] *public* attention"** *See James,* 40 N.Y.2d at 423, 386 N.Y.S.2d 871, 353 N.E.2d 834; *Lerman,* 745 F.2d at 136–37; *Contemporary Mission,* 842 F.2d at 617; *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583, 588–89 (1st Cir.1980).*"*

69.

*(1) National Public Radio never contacted (prior to the news or after) the plaintiff to give him the chance to reply and defend himself, nor did any other media outlet offer him a platform to counteract the allegations against him.* Although NPR's Standard and Practices' editors state that every effort must be made to try to contact those who you intend to cover in the news, more so if the story involves any controversy, and NPR's Code of Ethics and Conduct states very clearly what *"must"* be done (ALWAYS) by all journalists regarding contacting the subjects of their reports (*Try more than once and in more than one way to get in touch with them. One email is not enough. *Give them a reasonable amount of time to get back to us. *When news is breaking, make sure the people we're attempting to reach know about our deadlines — for the next newscast and the next program, for example. *If the subject of the story doesn't know what you're going to report, how can we be fair to them? *We give those whom we cover the

opportunity to respond to critical allegations in our reports.), the defendants never provided the plaintiff with the opportunity to reply to the article and broadcast, nor was he ever invited to participate in the radio broadcast.

70. (No other music news media outlet contacted the plaintiff; they simply republished what NPR, "The Most Trusted" media outlet, published and broadcasted.)

*(2) Important information to consider: This court still has to decide if they consider the cancellation of a record album sale on Discogs a matter of public concern.*

**More Supreme Court precedent.**

71. In Wolston v. Reader's Digest Assn., Inc., 443 U.S. 157, 61 L. Ed. 2d 450, 99 S. Ct. 2701 (1979), the U.S. Supreme Court held that a person who engages in criminal conduct does not automatically become a "public figure." The public figure status of a criminal defendant who is the subject of the alleged defamation in a libel case is to be determined *601 no differently than in any other libel case; namely, by focusing on the "nature and extent of an individual's participation in the controversy giving rise to the [alleged] defamation." 443 U.S. at 167 (citing Gertz)."

Even the status of a criminal is determined like in any other libel case; namely, by focusing on the *"nature and extent of an individual's participation in the controversy giving rise to the [alleged] defamation."*

**Just Recent Legal Decision:**

72. In *Vernon Unsworth v. Elon Musk,* the plaintiff Vernon Unsworth was categorized by the defendant Elon Musk, as a 'limited-purpose public figure.'

Judge Stephen V. Wilson wrote in his order (filed on Nov 18th, 2019) in *Vernon Unsworth v. Elon Musk*:

There is no dispute that Plaintiff "is not an all-purpose public figure," but **this Court must "examine the nature and extent of [Plaintiff's] 'participation in the particular controversy giving rise to the defamation' to determine whether [Plaintiff] is a public figure for the limited purposes of a defamation claim** . . . ." *Makaeff v. Trump Univ., LLC, 715 F.3d 254, 266 (9th Cir. 2013) ("Makaeff") (citing Gertz v. Robert Welch, Inc., 418 U.S. 323, 352 (1974)).* "Moreover, the limited public figure analysis is not a matter of state substantive law, but rather a pure constitutional question." *Id. at 270.* As the moving party, Defendant bears the burden of showing Plaintiff is a limited-purpose public figure. *D.A.R.E Am. v. Rolling Stone Magazine, 101 F. Supp. 2d 1270, 1276 (C.D. Cal. 2000)* ("the burden is on the moving party to demonstrate that it is entitled to summary judgment").

To determine if Plaintiff is a limited-purpose public figure, "we consider whether (i) a public controversy existed when the statements were made, (ii) whether the alleged defamation is related to the plaintiff's participation in the controversy, and (iii) whether the plaintiff voluntarily injected itself into the controversy for the purpose of influencing the controversy's ultimate resolution."

Based on this record, it is clear that a public controversy did exist, both at the time of the Tweets and the Email, but that controversy is limited to the subject of the Rescue and the viability of the Subs. Having identified two public controversies, for Plaintiff to be a limited-purpose public figure, the Plaintiff must have voluntarily injected himself into those public discussions.

For Defendant's comments to relate to Plaintiff's participation in the public controversies, there must be some relationship between pedophilia and the Recue or the Subs—there is simply no credible connection here. The limited-purpose public figure doctrine exists because "**[t]hose who attempt to affect the result of a particular controversy** have assumed the risk that the press, in covering the controversy, will examine the major **participants** with a critical eye." *Waldbaum, 627 F.2d at 1298.* But this eye only reaches "the issues at hand." *Id.* To allow criticism into every aspect of a plaintiff's life simply because he chose to get involved in a limited issue would render him an all-purpose public figure—effectively merging the limited-purpose public figure doctrine.

There is no relationship between the established public controversies, Plaintiff's role in the controversies, and Defendant's allegedly defamatory statements. Because Defendant's comments were not germane to Plaintiff's

*role in the public controversy, Plaintiff fails the second prong of the limited- purpose public figure test established in Makaeff.*

**Plaintiff is consequently a private person and may prove his defamation claims by the negligence standard** *established by California law. Brown v. Kelly Broad. Co., 48 Cal. 3d 711, 747 (Cal. 1989) ("[a] private-figure plaintiff must prove at least negligence to recover any damages"); see also Gertz v. Robert Welch, Inc., 418 U.S. 323, 353–54 (Blackmun, J.)*

73. **Not having had any participation in the controversy, the status of the plaintiff is 'private figure'; even if this court decided that the main issue at hand in this case (cancellation of the sale of the *301 Jackson St.* record album) was a public controversy, there was no participation of the plaintiff in the controversy; and also, "the issue at hand" does not reach, does not allow criticism into every aspect of the plaintiff's life.**

74. More excerpts from Judge Stephen V. Wilson's order on Nov 18, 2019, in *Vernon Unsworth v. Elon Musk*:

*i. Public Controversy*

*In the Ninth Circuit, "a public controversy 'must be a real dispute, the outcome of which affects the general public or some segment of it.'" Makaeff, 715 F.3d at 270 (citing Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1296 (D.C. Cir. 1980)). Although it is not for this Court to "question the legitimacy of the public controversy," Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1297 (D.C. Cir. 1980)) ("Waldbaum"), not every subject that might draw public attention will have an impact on the public. See Time, Inc. v. Firestone, 424 U.S. 448, 454 (1976) ("[d]issolution of a marriage through judicial proceedings is not the sort of 'public controversy' referred to in Gertz, even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public"); see also Partington v. Bugliosi, 56 F.3d 1147, 1159–60 (9th Cir. 1995) ("while the divorce of a socialite does not in itself constitute[] a matter of public controversy . . . controversial trials that raise questions concerning the fairness of the justice system*

*clearly do.") (internal citation omitted). There was indisputably a public controversy over the Rescue—**it*** *receive wall-to-wall media attention throughout 2018 (even after the rescue was completed)** and involved* *the entire **Thai government** and **aid from several other nations including the United States**. Dkt. 58 at 12–* *13. **This is precisely the sort of public controversy anticipated by the limited-purpose public figure doctrine*** *—where "the press was covering the debate, reporting what people were saying and uncovering facts and* *theories to help the public formulate some judgment." Walbaum, 627 F.2d at 1297.*

**75. This opinion supports that the "the issue at hand" in this case was not a "public controversy."**

*ii. Plaintiff Injected Himself into the Controversy*

*When "an individual voluntarily injects himself or is drawn into a particular public controversy,"* *he "thereby becomes a public figure for a limited range of issues." Gertz v. Robert Welch, Inc.,* *418 U.S. 323, 351 (1974). "Under Gertz, [Plaintiff] must have 'thrust [itself] to the forefront' of* *this particular controversy 'in order to influence the resolution of the issues involved.'" Makaeff,* *715 F.3d at 267. Plaintiff easily satisfies the third prong of the limited-public figure test regarding* *the public controversies of the Rescue and the Subs. After rising to international prominence* *through numerous new reports, **Plaintiff voluntarily appeared before millions of viewers in the*** ***CNN Interview and directly criticized the Subs**. Dkt. 1 ¶ 70.* *There is no question that Plaintiff **did more than simply "respond[] to press inquiries or*** *attempt[] to reply to comments on oneself through the media . . . ."** Waldbaum, 627 F.2d at 1298* *n.31.*

**76. The plaintiff in this case, William Yeager, didn't "appeared," or "respond to press inquiries"; not only did he not appear or respond, but he was never offered the opportunity to appear or respond by neither the defendants nor by any other media outlet.**

**Another Recent Legal Decision:**

77. These are excerpts from the case file 4:18-cv-00442-ALM-CMC:

*Defendants next argue the R&R incorrectly finds Plaintiff was not a limited-purpose public figure.13 Dkt. #63 at 21-22. According to Defendants, the R&R recognizes Plaintiff was an "internationally recognized expert in the investment wealth management industry" and "has made hundreds of appearances on national and radio shows."14 Id. at 21.*

78. *As correctly stated in the R&R, a limited-purpose public figure is a public figure only "for a limited range of issues surrounding a particular public controversy." Rodriguez v. Gonzales, 566 S.W.3d 844, 850 (Tex. App. – Houston [14th Dist.] 2018, pet. denied).*

79. *Texas courts utilize a three-part test in analyzing whether an individual is a limited-purpose public figure: (1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy. Id. at 850. In other words, limited- purpose public figures "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. . . ." Klentzman I, 312 S.W.3d at 904.*

80. ***An individual is not a limited-purpose public figure when a media defendant discusses the individual repeatedly or where the individual's actions become a matter of controversy as a result of the media defendant's actions.*** *Id. at 905 (citation omitted). A defamation defendant must show the plaintiff "relinquished. . . his interest in the protection of his own name" by "engag[ing] the attention of the public in an attempt to influence the resolution" of "an issue of*

*public concern." Id.*

81. ***Accepting the factual allegations in the complaint as true and viewing them in the light most favorable to Plaintiff, this Court finds Plaintiff's actions did not rise to the level of qualifying him as a limited-purpose public figure.*** *As noted by the R&R, Plaintiff's involvement in the Seth Rich investigation and Plaintiff's communications with Wheeler were both limited.*

82. ***Plaintiff's past appearances on national media outlets is inapposite to the limited-purpose public figure analysis.*** *Overall, at this stage of the proceedings, the facts do not show Plaintiff had anything more than a tangential role in the controversy surrounding the Seth Rich investigation. The Court overrules Defendants' fifth main objection. END*

83. **It is obvious the plaintiff is not a public figure; while Ed Butowsky is an "internationally recognized expert in the investment wealth management industry" and "has made hundreds of appearances on national and radio shows," as NPR stated the plaintiff is a "complete unknown" and "no one has ever heard of him."**

84. **Regarding the limited-purpose public figure status: The district court in Texas stated that *"the facts do not show plaintiff had anything more than a tangential role in the controversy surrounding the Seth Rich investigation"* and therefor allowed the case to move forward.**

85. **In this case, the fact that the plaintiff recorded a record album over 29 years ago does not represent even a *"tangential role"* in the controversy; considering there was no *"voluntary thrusting,"* no *"participation,"* no *"media appearance/role,"* the plaintiff fails the**

**criteria to be considered a limited-purpose public figure.**

86. **Evidence proving the cancellation of the sale of a record album was not a controversy or a matter of public concern.**

87. "In Time, Inc. v. Firestone, 424 U.S. 448, 458, 96 S.Ct. 958, 967, 47 L.Ed.2d 154 (1976), the Supreme Court rejected the equation of "public controversy" with all disputes of interest to the public. Mere newsworthiness, it stated, is not sufficient to create a public controversy. See Wolston v. Readers Digest, 443 U.S. at 167-68, 99 S.Ct. at 2707-08. In Avins v. White, 627 F.2d at 647, we cited with approval the District of Columbia Circuit's definition that a public controversy "*must be a real dispute, the outcome of which affects the general public or some segment of it*." Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287, 1296 (D.C.Cir.), cert. denied,449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980). To be "public," the dispute must affect more than its immediate participants.

88. Public Interest: is a common concern among citizens in the management and affairs of local, state, and national government, affecting the rights, health, or finances of the public at large. It does not mean mere curiosity. Public Controversy: is a state of long term dispute or debate, generally about a topic that affects a large proportion of the public, that creates conflicting opinion.

89. To make its decision this court must consider the test developed by Chief Justice John G. Roberts (4).

90. It must also be considered that NPR was the only major media outlet that covered this piece of

news (the cancellation of the sale of a record album (a sale that happened 3 months before) in Discogs), which proves that this was not even a case of *"newsworthiness"*; that there was no *"real dispute"* and no *"debate"*; and that it didn't affect the general public.

(4) Considered a landmark case, *Snyder v. Phelps*, 562 U.S. 443 (2011) "matters of public concern" were finally addressed by the Supreme Court voting an 8-1 ruling in favor of Phelps, several tests were framed by Chief Justice John G. Roberts that were major factors that helped the Justices make their decision regarding what should be considered "a matter of public concern." Chief Justice's three variables were required to consider (1) *content* of the speech; (2) *form* of the speech; and (3) *context* of the speech. The Court made it clear that consideration of these factors is mandatory, not simply suggested or recommended, also emphasizing that "[i]n considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including *what* was said, *where* it was said, and *how* it was said." Chief Justice Roberts's reasoning squares solidly with that of the Court's interpretation of a message's meaning in obscenity cases, under which "the First Amendment requires that redeeming value be judged by considering the *work as a whole*." Ashcroft v. Free Speech Coal., 535 U.S. 234, 248 (2002) Chief Justice John G. Roberts also framed a disjunctive test to determine whether a statement relates to a matter of public concern, stating that a statement related to a matter of public concern if:(1) the statement related *"to any matter of political, social, or other concern to the community,"* or (2) the statement related to *"a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."* Finally to determine if the WBC's speech was about a matter of public or private concern, Chief Justice Roberts made it clear that the inquiry must be highly fact specific, taking into account *"all the circumstances of the case,"* with the lone exception of whether the speech is inappropriate or controversial in character.

91. Considering all the information mentioned above, the news regarding 'the cancellation of the sale in Discogs' don't relate to a matter of public concern/public controversy.

92. In *Buller v. Pulitzer Publishing Co.,* a reporter sought the services of a professional psychic and then published an article portraying her as a fraud, or at least as a joke. The Missouri court of appeals considered that the woman's psychic abilities and the nature of her consultation with clients was a private matter; and the disclosure was offensive because she was depicted as doing her work in an unprofessional manner. But most importantly, the court found that her consultation with clients were not of legitimate public concern. Unless she was accused of a crime, or predicted world disaster, there was nothing newsworthy about her work.

93. The official statement in the press release that Discogs sent to NPR specifically reported that the sale of the *301 Jackson St.* record album had been cancelled because they believed it to be fraudulent. Discogs also stated that the seller and the buyer of the album were located in 2 different states and had different IP addresses.

94. But Discogs never accused the plaintiff of being the perpetrator of a fraudulent sale. It must also be considered NPR's story was a news article (not an opinion column) written by a reporter (not an opinion columnist) and therefor was meant to specifically address the 'brief statement' sent to NPR by Discogs (the cancellation of the sale of the record album), therefor, in this case where precedent and evidence prove that the plaintiff is private figure (even if this 'brief statement' was considered a matter of public concern), the defamatory falsehoods referring to his life (misrepresenting his career, his work, his motivation and purpose in life, his private thoughts and feelings), whether this court considers these defamatory falsehoods 'statements of opinion,' are

not protected by the First Amendment, because the petitioner is not a person of "public interest" (in NPR's own words, "a complete unknown") and the statements were unnecessary to report the news (the cancellation of the sale of the *301 Jackson St.* record album) communicated by Discogs, and were of no legitimate public concern.

95. 410 U.S. 113 (1973) The central Supreme Court decision that created current abortion law in the U.S. is *Roe v. Wade*. The Ninth Amendment not only has been stretched to encompass privacy, liberty, and a woman's reproductive choices.

96. The Ninth Amendment states that the "enumeration of certain rights" in the Bill of Rights "shall not be construed to deny or disparage other rights retained by the people. The Supreme Court said in the 1977 case of Moore v. East Cleveland that "*the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in the Nation's history and tradition*."

97. The early years in the development of privacy rights began with English common law. Those rights expanded to include a "*recognition of man's spiritual nature, of his feelings and his intellect*." The *"natural rights"* theory is based largely on the word *"retained"* in the Ninth Amendment.

98. NPR's article and broadcast violated the plaintiff's Ninth Amendment rights to personal privacy when addressing his wife in their article, including personal information (especially considering the information was false) about how and why they were married, and the plaintiff's private thoughts in a news story and broadcast that was about the "cancellation of a sale of a record album."

99. **Considering that precedent and evidence prove that the plaintiff is a private figure, the plaintiff needs to prove only negligence to recover for defamation** (even though in this case actual malice also exists.)

100. As a private figure **defamatory falsehoods regarding his personal/private thoughts/ feelings  ("motivation," "ambitions," "motives," "intent") are not protected.**

**EVIDENCE of NEGLIGENCE**

101. **Negligence** is a failure to exercise appropriate and or ethical ruled care expected to be exercised amongst specified circumstances. The core concept of negligence is that people should exercise reasonable care in their actions, by taking account of the potential harm that they might foreseeably cause to other people or property.

102. The defendant's actions are judged by the standard of the reasonable man in the defendant's position: *Blyth v Birmingham Water Works* (1856). The standard of care for professionals is of the reasonable professional having or holding himself out as having the skill or ability in question. Learners and the inexperienced will also be judged against the standards of the fully-qualified.

103. The defendants are expected, the same as any other professional in the United States of America, to exercise reasonable care in their actions, by taking account of the potential harm that they might foreseeably cause to other people or property.

104. The defendants, as part of the 'public media' system in the USA, not only have a bigger responsibility than other media outlets in the country to serve the public (by informing, educating,

enlightening and enriching the public and helping inform civil discourse essential to American society), but they also have Duty of Care to all American citizens. In this case the defendants failed to live up to their professional standards and committed a breach of duty.

105. Although the tortious act was initiated by NPR journalist Andrew Flanagan, who failed in his responsibility to apply and enforce NPR's CODE, committing an extensive amount of serious violations, he is not the only one who contravened the code, and he is not the only one responsible; his superiors are also responsible, **even more so considering NPR's** own **statements**.

106. As stated by NPR in their Code, *"Editors and producers have special responsibility for application of this Code to matters they are editing or producing. For each story that is produced, they should be satisfied that the standards of this Code have been met.*
*NPR journalists who do not comply with the Code may be subject to disciplinary action up to and including termination.")*

107. National Public Radio is the leader of public radio in the United States of America. NPR clearly states on their website that they meet the highest standards of **public service** in journalism, at the core of which ethical guidelines are.

108. NPR's ethical guidelines are so well known that they are used by the rest of Public Radio Stations in the United States, such as *Vermont, New* Hampshire, and Milwaukee public radios.

109. NPR and the rest of public radios in the United States state that the purpose of having a code of ethics and practices is to ensure standards of honesty, integrity, impartiality and conduct of staff.

110. Excerpts from the information NPR states on its website:

*"This is NPR. And these are the standards of our journalism. Our Mission*

*NPR's **rigorous reporting** and unsurpassed storytelling connect with **millions of***

***Americans** every day—on the air, online, and in person. Listeners consider public*

*radio an enriching and enlightening companion; they **trust** NPR as a daily source of*

***unbiased** independent news, and inspiring insights on life and the arts."*

111. This case is only one of the many cases in the history of NPR in which they have failed the

public and the subject of their reports. There was no "rigorous reporting" or "inspiring insights,"

instead, both the news article and radio broadcast were completely biased against the plaintiff

(purposely misrepresenting his work, distorting the truth and presenting the plaintiff in a most

negative false light) and contained numerous false/defamatory statements.

112. Every member of NPR (and every member of NPR member stations) is fully aware that they

have a greater responsibility than any other media outlet to serve the public with integrity:

- NPR: *"For people to trust the news and information we report, they must have faith in*

*our integrity. We should never give them cause to doubt that our first loyalty is to the*

*public – not to our bank accounts, our political agendas, our friends, our funders or*

*any other cause or purpose. Public service should be the goal of any journalist, but **it***

***has special meaning for us, because we call ourselves "public media.""***

- NPR: ***"NPR is pledged to abide scrupulously by the highest artistic,***

***editorial, and journalistic standards and practices of broadcast***

***programming."***

113. Journalists, especially in 'Public Media,' are not supposed to liberally choose when to comply with policies on conflicts of interest and ethical standards. As stated in NPR's Code of Ethics and Practices, journalists MUST comply, because their listeners trust them to provide honest portrayal of issues and events in all of their broadcasts.

114. The same as in any other Public Radio Station in the United States, in NPR, their Code of Conduct MUST govern their work.

NPR's states that:

- All their journalists **must always** be **fair** and perform their work in a manner **consistent with** NPR's **ethical principles.**

- NPR's **editors** and **producers** should **make sure** that NPR's **journalists live up to** NPR's **standards**.

- Even in the case of outside contributors, if their actions are in conflict with the principles in this handbook, NPR may turn down a story pitch and/or decide to cut ties with that person entirely.
- Even in the case of producers of acquired programming, NPR expects that they will be aware of the ethical principles and guidance in NPR's handbook and will **consult with the vice president of Programming** before problems arise.

115. It is absolutely clear that NPR's Handbook is **not** supposed to be an ornament. As the leader of 'public radio' in the United States, and as a recipient of funds from the government and private individuals, NPR is expected (by the citizens of the United States and NPR's audience all over the

world) to live up to professional journalistic standards by following and applying the principles
and rules contained in their Codes.

116. The violations that were committed by NPR in this case did not only happen at the
journalistic level; senior editors **(1)** and supervisors are also responsible.

**(1)** On NPR Ethics Handbook it is written: Alongside this handbook, your two best sources
of help in making ethical decisions are (1) your supervisor and (2) NPR's Standards and
Practices Editor.

The Standards and Practices Editor is a resource – someone to help you raise the right
questions, involve the appropriate stakeholders and **uphold our standards** as you do
your work. **Well-versed** in the workings of our news operation, this editor is
responsible for facilitating thoughtful, consistent ethical decision-making on any matter
related to our journalism.

**The Standards and Practices Editor** is also charged with cultivating an ethical
culture throughout our news operation. This means he or she **coordinates** regular
training and discussion on **how we apply our principles**, monitors our decision-
making practices to ensure we're **living up to our standards,** and oversees the
continual development of the ethical guidelines collected in this handbook.

117. In this case, not only did the defendants not care about destroying the life of the plaintiff and
his wife, but **they did not care about misinforming the public; they were not concern about
telling the public the truth, but creating a sensational story.**

118. It is a fact that NPR employs journalists with a high degree of experience; journalists Andrew Flanagan and Jacob Ganz and their supervisors clearly knew what they were supposed to do.

119. Due care can be demonstrated by showing that the journalist acted according to nationally accepted practices of journalism. Several sources can be consulted in defining journalism standards. Standards are developed through formal journalism education and on-the-job experience. A major source of standards of practice, though, can be the code of ethics adopted by a professional organization. **Adherence to freely adopted standards should present an unusually strong libel defense.**

120. **In this case the opposite occurred.**

**What follows are some of the journalistic rules that were violated by NPR in this case:**

121. An excerpt from The Society of Professional Journalists, Sigma Delta Chi:

1. ACCURACY AND OBJECTIVITY **Good faith** with the public is the foundation of all worthy journalism. 1. **Truth** is our ultimate goal.

2. **Objectivity** in reporting the news is another goal, which serves as the mark of an experienced professional. It is a standard of performance toward which we strive. We honor those who achieve it.

3. **There is no excuse for inaccuracies or lack of thoroughness.**

4. Newspaper headlines should be fully warranted by the contents of the articles they accompany. Photographs and telecasts should give an accurate picture of an event and not highlight a minor

incident out of context.

5. Sound practice makes **clear distinction** between **news reports** and **expressions of opinion. News reports should be free of opinion or bias and represent all sides of an issue.**

6. **Partisanship** in editorial comment **which knowingly departs from the truth violates the spirit of American journalism.**


**122.  FAIR PLAY** Journalists at all times will show **respect for the dignity, privacy, rights, and well-being of people** encountered in the course of gathering and presenting the news.

1. **The news media should not communicate unofficial charges affecting reputation or moral character without giving the accused a chance to reply.**

2. The news media must guard against invading a person's right to privacy.

3. The media should not pander to morbid curiosity about details of vice and crime.

4. **It is the duty of news media to make prompt and complete correction of their errors.**

5. Journalists should be accountable to the public for their reports and the public should be encouraged to voice its grievances against the media. Open dialogue with our readers, viewers, and listeners should be fostered.


123.  PLEDGE **Journalists should actively censure and try to prevent violations of these standards, and they should encourage their observance by all newspeople.** Adherence to this code of ethics is intended to preserve the bond of mutual trust and respect between American journalists and the American people. Code of Ethics (Society of Professional Journalists, Sigma Delta Chi 1973), reprinted in W. Rivers, W. Schramm & C. Christians, supra note 38, at 291-94 app.A. 122.


The Statement of Principles of ASNE provides in its entirety as follows:

124. PREAMBLE The First Amendment, protecting freedom of expression from abridgment by any law, guarantees **to the people** through their press a constitutional right, and thereby **places on newspaper people a particular responsibility.** Thus journalism demands of its practitioners **not only industry and knowledge but also the pursuit of a standard of integrity proportionate to the journalist's singular obligation.**

125. The members of NPR's journalistic and programming teams that participated in the defamatory article and broadcast against the plaintiff did not live up to the most basic standards any media outlet must hew to. They acted with recklessness (with "an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers") and in consequence the plaintiff's reputation, work, and benefit concerts were destroyed and the plaintiff was injured.

126. Flanagan and Ganz's supervisors are liable for negligence and malpractice (professional negligence) because they failed to ensure the standards of NPR's Code were met.

127. This is a serious case of malpractice (especially for National Public Radio) in which even the most fundamental methods and practices ordinarily used in preparing a news story to assure reasonably accurate reporting were ignored and the most basic standards of the journalistic profession were violated.

128. When NPR's Senior legal counsel Ashley Messenger was contacted by the plaintiff, she knew that comparison of the journalist's conduct to that of other journalists is a factor to be considered in determining whether the journalist acted with due care.

129. She also knew that in some courts it is the journalists' actions, rather than the nature of the

allegedly defamatory statement, that is scrutinized in determining liability, and in this case the journalistic conduct and actions were way below nationally accepted journalistic standards.

130. With this knowledge, it is clear why Messenger, an experienced media law attorney, began to communicate (back and forward) with the plaintiff (and his wife). (At the same time, since the beginning, Messenger (and her superiors) knew they were dealing with an individual that was completely unknown and severely damaged.)

131. Ashley (and her superiors) knew that NPR had committed very serious violations, such as:

1. Publishing and broadcasting accusations of fact that had not been verified and for which there was no evidence other than evidence that indicated that the accusations made by NPR against the plaintiff were false.

a) The American Society of News Editors states that **"[e]very effort must be made to assure that the news content is accurate, free from bias and in context, and that all sides are presented fairly."** Additionally, it requires that a **clear distinction** be made for the reader **between news reports and expressions of opinion.** The SPJ/SDX code demands the same **objective, unbiased reporting.** Moreover, just as in other professions, journalism students are trained to develop a sense of **impartiality** or professional detachment. Detachment is considered a prime characteristic of professions generally. Cultivating detachment in order to prevent self-interest from affecting professional work is considered by most journalists and journalism educators to be a prime objective. **Evidence that a reporter sought to maintain a distance while developing a news story, considering possible alternative sources of information, tends to show that the reporter sought accuracy and achieved it as best he could.** That would constitute due care. **Conversely, failure to maintain a professional detachment could be**

**accorded great weight in a determination of liability.**

132. Only one source who had met the plaintiff (22 years ago when he wrote a film review of the plaintiff's first feature film) was interviewed for the story, even though this source had not been in contact with plaintiff for over 17 years. NPR's CODE states that the information provided by sources must be questioned and their answers must be compared to other sources' replies. NPR's Code also states that in these type of cases (of a single source) the senior vice president and vice president of news, and the supervising senior editor of standards and practices must be contacted. How could Andrew Flanagan and Jacob Ganz's editors allow them to proceed in the distribution of extremely negative information (which without a doubt would destroy the plaintiff's reputation) to millions of people around the world, when no verification of any of the accusations had been done, and their only source had not spoken to plaintiff for over 17 years? The source not only provided false information about the plaintiff, but also about the plaintiff's wife, whom the source had NEVER met or spoken with in his life.

133. **NPR's CODE clearly indicates that only in very special occasions such as when the news are urgent and people's lives could be in danger will NPR rush a report. The news about the record were not "urgent" in any way.**

134. **Because of this reason (in accordance to their standards) NPR should have waited, instead of putting a person's reputation and life in danger.** It is obvious that Andrew Flanagan and his editor did exactly what NPR claims they don't do ("think about themselves only," "try to be the first ones to break the news") at the cost of the plaintiff, betraying him and NPR's audience. A press release was sent to NPR by Discogs at the early hours of the morning (4 am) and by 9:48 AM ET the story was published. After they received the press release at 4 am, NPR made NO attempt (they sent NOT A SINGLE email) to inform the plaintiff of the breaking news

that would come almost 6 hours later. AFTER the breaking news, NPR AGAIN violated their most elemental standards, and made NOT ONE single attempt to contact the plaintiff to allow him the chance to reply to the serious allegations made against him. NPR's CODE states journalists MUST continue persistently and diligently until they reach the subject of their report.

135. a) Both codes emphasize the importance of journalists' seeking a response when reporting harmful information about a person. The SPJ/ SDX code states that "**[t]he news media should not communicate unofficial charges affecting reputation or moral character without giving the accused a chance to reply.**" The ASNE Statement of Principles states that "**[p]ersons publicly accused should be given the earliest opportunity to respond.**" This comports with the "apparent danger" doctrine, under which **a journalist is deemed to have good reason to doubt the accuracy of a story whenever danger to reputation is apparent from its substance.** Failure to take extra precautions before publishing a story the danger of which is apparent may result in a finding of actual malice reckless disregard of the truth or falsity of a story--on the journalist's part. **By giving the accused an opportunity to respond to charges affecting moral character, journalists may prevent a finding of actual malice in such circumstances.**

136.  After the plaintiff proved to Ashley Messenger that the article was full of inaccuracies, wrong information, and lies, the article was taken down, but when the plaintiff informed Ashley Messenger that taking the article down would not be enough for all the serious damages that had been done, NPR **put the article back on their website.** The defendants knew that the plaintiff had no lawyer and he was severely damaged (including not only his work and reputation, but he was in a serious mental and emotional state). With this knowledge, instead of following the procedures clearly indicated in NPR's CODE and fulfilling their duty of care due, NPR's management team tried to fix the situation thinking only of the best way to protect themselves; it is obvious that they didn't feel very threatened by a damaged plaintiff without a lawyer.

137. a) Journalism code provisions also emphasize **the duty of journalists to rectify errors**

**promptly** as a way of ensuring credibility and, perhaps in part, of eliminating libel suits.

Retraction statutes in existence in many states recognize **the basic moral and ethical principle**

**that one should admit one's errors.** These statutes serve to mitigate damages, but not to

preclude liability, for news media defendants who meet the terms of the statutes. Although a

defendant's compliance with a retraction statute may assist in establishing that the defendant has

acted as a prudent publisher, **it is** at the same time **an admission of error, something potential**

**defendants may be loath to do.** Juries seem to be inclined to equate error with negligence.

Proper application of the fault standards, however, could make a timely retraction a useful

defensive device in that it shows conformity with professional and social standards. If the focus is

where it should be-on the steps taken in reporting, not on the results of that reporting-a retraction

may help.

138. Slyly NPR's legal counsel and corporate team tried to make the plaintiff believe they were

going to offer him a "special opportunity," when **in FACT** it was a **delayed DUTY** (about 3

months later) owed to every person NPR reports on. NPR's CODE states very clearly NPR's

duty; NPR is required (ALWAYS) to persist in contacting the subject of their reports, specially

when serious accusations and allegations have been made against him; even in the case of a

person that is dead, the journalist MUST find someone that speaks in the interest of that person.

139. NPR's Code states that when they don't do this they have failed. In this case, NPR acted

with most reckless disregard for the plaintiff and failed **beyond doubt**; not only did NPR not

"persist in contacting" the plaintiff, but they didn't make ONE SINGLE attempt to inform him

about the breaking news and to give him the chance to defend himself.

140. By departing from standards which exist as standards of professional conduct in the news media industry, NPR journalists UNFAIRLY destroyed a person's reputation and severely harmed him.

141. The degree of negligence in this case is extreme, and in areas it clearly enters into the area of recklessness and malice (this is not just a case where information on one side was unfairly treated better, but a case where EVERYTHING stated in the plaintiff and his wife's websites was purposely ignored; every person that had witnessed their work or worked with the plaintiff and had relevant, enlightening, positive and reliable information to provide to NPR was ignored, only minute pieces of information that could easily be manipulated, taken out of context was chosen by NPR journalists Andrew Flanagan and Jacob Ganz, and their editors to be shared.)

142. The standards that were violated by members of NPR were so elemental that not even a small media outlet could try to get away by setting artificially low standards.

143. The use of a national standard is justified by the increasing national uniformity of journalism practices, which has been fostered by three developments.

144. First, journalism, like law and medicine, has developed a standard educational experience for its members. Most newly-hired journalists arrive at work with a degree from a journalism school, college or department. To a significant extent, they have taken the same "core" courses just as all lawyers take similar "core" courses.

145. Required courses in most journalism programs include news writing, reporting, editing, advanced reporting and communication law.

146. Most programs also require the study of journalism ethics, although there is debate whether it should be taught in a separate course or within the communication law course.

Second, national journalism organizations that are deeply involved in considering ethics issues have been formed.

147. Third, these organizations have adopted voluntary ethics codes that apply to their broad memberships.

148. Although journalism, unlike medicine and law, has no entry examination, in those professions as in journalism the schools are the primary filters through which a would-be member must pass. **Mandatory instruction in journalism ethics programs, along with an apparent willingness to question its own, is evidence that the journalism profession takes its ethical responsibilities seriously. There is a large body of literature on journalism ethics, and journalists accord a great deal of thought and time in professional meetings to ethical matters. The existence of that concern should be reflected in adjudicating libel actions.**

149. **It is clear journalists have a social responsibility and a duty. The codes are useful in showing minimum professional standards of behavior and critical in showing that journalism functions as a profession. The standards in these codes determine the degree of malpractice.**

150. Below are some of the obligations that NPR and all of its members have, but the defendants violated:

ARTICLE I-**Responsibility:** The **primary purpose** of gathering and distributing news and opinion **is to serve the general welfare** by informing the people and enabling them to make

judgments on the issues of the time. **Newspapermen and women who abuse the power of their professional role for selfish motives or unworthy purposes are faithless to that public trust.**

ARTICLE IV-**Truth and Accuracy: Good faith with the reader** is the foundation of good journalism. **Every effort must be made to assure that the news content is accurate, free from bias and in context, and that all sides are presented fairly.** Editorials, analytical articles and commentary should be held to the **same standards of accuracy with respect to facts** as news reports. Significant errors of fact, as well as errors of omission, **should be corrected promptly and prominently.**

ARTICLE V-**Impartiality:** To be impartial does not require the press to be unquestioning or to refrain from editorial expression. Sound practice, however, **demands a clear distinction for the reader between news reports and opinion.** Articles that contain opinion or personal interpretation **should be clearly identified.**

ARTICLE VI-**Fair Play: Journalists should respect the rights of people involved in the news**, observe the common standards of decency and stand accountable to the public for the fairness and accuracy of their news reports. **Persons publicly accused should be given the earliest opportunity to respond.**

151. **These principles are intended to preserve, protect and strengthen the bond of trust and respect between American journalists and the American people, a bond that is essential to sustain the grant of freedom entrusted to both by the nation's founders.** Statement of Principles (American Society of Newspaper Editors 1975).

152. The defendants voluntarily disregarded the need to use reasonable care.

Because journalist Andrew Flanagan was new at NPR (he had been in the job for about 3 months), his supervisors, as well as those that were supposed to train him and guide him, held a great responsibility to ensure that Andrew knew and adhered to American journalistic and NPR's standards and followed the accepted methods in the journalism profession.

153. The lack of respect and consideration for the plaintiff (and his wife) is intolerable under any professional journalistic standards.

154. Ashley Messenger and her superiors in the corporate team and legal team, including members from NPR board of directors, knew that the rush in which the story had been written, the 100% bias against plaintiff, the lack of sources, the lack of attempts to seek responses to unverified accusations, and many other serious violations were a complete departure from the NPR's CODE.

155. (NPR clearly states journalists must use multiple RELEVANT sources. NPR: *'Can We Go With It?' Maybe Not, Because 'One And One And One' Isn't Always Three. What we want, ideally, is our own on-the-record confirmation — and not from that same person who has spoken to the wires, but from others who are in a position to know. If that's not possible yet and the news is of such importance that we decide it needs to be reported, we still want to see multiple news reports that are based on multiple sources who are in a position to know. Can you come up with a scenario in which we report something that's coming from just one source or one news outlet? I suppose. But it has to be really important news. And we don't do that without considerable discussion involving the executive editor, the deputy managing editors, the standards & practices editor and others. Memmos, June 18, 2014)*

156. The fact that Andrew Flanagan never verified the information he received from the only source he interviewed that had met the plaintiff over 17 years ago, and the fact that Discogs never accused the plaintiff, but stated there was a BUYER and a SELLER in 2 different states, are 2 of the many factual reasons that should have been a red flag to Andrew Flanagan's supervisors.

157. But what is most baffling is the fact that (after the breaking news article was published and after the radio broadcast was aired) not a single editor or supervisor told Andrew Flanagan or Jacob Ganz to contact the plaintiff and offer him the chance to respond to the allegations made (to millions of people around the world) against him; there was not one single attempt made!

158. NPR's legal counsel, whose chief is Jonathan Hart, also knew that Andrew Flanagan and Jacob Ganz's editors failure to require further investigation when the danger of the story to plaintiff's reputation was readily apparent could render NPR ripe for a suit even if the reporter involved had no suspicion of the danger. Because editors are the primary means within a news organization of ensuring that a story meets the standards of journalism, and are empowered to exercise the greatest judgment and discretion in most news organizations, the role of the editor is a significant area of inquiry in libel actions.

159. **The facts demonstrate that NPR's story was not prepared in accordance with accepted journalistic practices.**

160. *Responsible and conscientious members of the press should be as sensitive to the importance of accurate reporting as those about whom they report.*

161. Not only there was clear negligence, but an examination of the codes shows that the defendants departed drastically from prevailing practices and didn't act in good faith but with

actual malice.

162. The defendants' breach caused a pecuniary and non-pecuniary injury/losses.

**Overview of the principles that were violated by the defendants:**

163. Almost every principle enunciated in the statement number III of the CODE was violated by the defendants: Andrew Flanagan, Jacob Ganz, and *All Things Considered* radio Host Audie Cornish — who ended the coverage on the plaintiff with the following derogatory/defamatory remark stating to their large audience that the plaintiff HAD NOT EARNED his success, which was basically telling the audience that the plaintiff was an undeserving person because he was motivated by ill motives and did bad things!

"Alright, well the kicker this week is new music from somebody who HAS earned their success, right?" – Audie Cornish

164.

## III. Statement of principles

Our coverage must be **fair, unbiased, accurate, complete and honest**. At NPR we are expected to conduct ourselves in a manner that leaves no question about our independence and fairness. We must treat the people we cover and our audience **with respect**.

"Fair" means that we present **all important views on a subject**. This range of views may be encompassed in a single story on a controversial topic, or it may play out over a body of coverage or series of commentaries. But at all times **the commitment to presenting all important views must be conscious and affirmative**, and **it must be timely** if it is being accomplished over the course of more than one story. We also assure that **every possible effort** is made to reach an individual (or a spokesperson for an entity) that is the subject of criticism, unfavorable allegations

or other negative assertions in a story in order to allow them to respond to those assertions. "Unbiased" means that **we separate our personal opinions** – such as an individual's religious beliefs or political ideology – from the subjects we are covering. We do not approach any coverage with overt or hidden agendas.

"Accurate" means that each day we make **rigorous efforts at all levels of the news gathering and programming process** to ensure our facts are not only accurate but also presented in the correct context. We make **every possible effort** to ensure assertions of fact in commentaries, including facts implied as the basis for an opinion, are correct. We **attempt to verify** what our sources and the officials we interview tell us when the material involved is argumentative or open to different interpretations. We are skeptical of all facts gathered and report them only when we are reasonably satisfied of their accuracy. **We guard against errors of omission that cause a story to misinform our listeners by failing to be complete. We make sure that our language** accurately describes the facts and **does not imply a fact we have not confirmed**, and quotations are both accurate and placed properly in context.

"Honest" means we do not deceive the people or institutions we cover about our identity or intentions, and we do not deceive our listeners. We do not deceive our listeners by presenting the work of others as our own (plagiarism), by cutting interviews in ways that distort their meaning, or by manipulating audio in a way that distorts its meaning, how it was obtained or when it was obtained. The same applies to text and photographs or other visual material used on NPR Online. **Honesty also means owning up publicly and quickly to mistakes we make on air or online.**

"Respect" means **treating the people we cover** and our audience **with respect** by approaching subjects in an open-minded, sensitive and civil way and by recognizing the diversity of the country and world on which we report, and the diversity of interests, attitudes and experiences of our

audience.

**Be judicious when passing along breaking news.**

When news is breaking, we may need to pass along information reported by others because the public should know about it immediately. **This is particularly true when safety is an issue** (**severe weather events** or other types of **emergencies**, for example).

If it's determined that something is **so important** that the public needs to know about it now, even before we've had a chance to thoroughly vet the information, be transparent: state what we're certain of, what we don't yet know and how our information was acquired. **And again, if we have information that might cause significant grief or might potentially put someone in harm's way, we do not report it until it's been thoroughly verified and senior editors have given their approval.**

165. It is appalling that the plaintiff was denied the chance to defend his reputation on National Public Radio, which states: "*THIS MEANS WE GIVE those whom we cover the opportunity to respond to critical allegations in our reports*."

166. (The knowledge that the defendants had prior to the publication and broadcast proves that they acted with actual malice, either knowing something is false or with reckless disregard towards the truth. Instead of publishing the information received from Discogs, in violation of NPR's standards, with no due care, NPR published and broadcasted accusations/statements that they knew would destroy the reputation of the plaintiff and damage him. Also, the crucial omission of factual information that the defendants found in the plaintiff and his wife's websites that was contrary to what the defendants stated against the plaintiff proves actual malice.

167. If the interest of the public is paramount, in this case the audience was lied about the character of the plaintiff, the meaning of his work, and his mission and purpose in life.

168. To compensate for the lack of proof NPR distorted the truth by manipulating/misrepresenting information and fabricating false information regarding the plaintiff's work, career, character, mission and purpose in his life to support their accusations.)

**Stating a Claim for Defamation and False Light / List of Alleged False and Defamatory Statements**

169. Broadly there are four elements that the Plaintiff is required to prove in a defamation lawsuit, whether for libel or slander. These are as follows:

- The statement, which must be about another person, must be false.

- The statement must be 'published' to a third party, who cannot also be the person who is being defamed.

- If the nature of the statement is 'of public concern' the person who has published it must be at least liable in negligence. Public figures who seek to prove that they have been defamed must prove an additional element under the First Amendment of the US Constitution, that in publishing the statement the Defendant was acting with 'actual malice.'

- The person about whom the defamatory statement is made must be 'damaged' by the statement.

170. In some states, it is sufficient to establish that the Plaintiff suffered 'mental anguish' as opposed to 'damage.'

171. Context and the Totality of the Circumstances: In general, courts will look at the context and

medium in which the alleged defamation occurred. For example, a statement is more likely to be regarded as an opinion rather than a fact if it occurs in an editorial blog as opposed to a piece of investigative journalism.

172. The article written by journalist Andrew Flanagan was published by NPR in their 'Music News' section called: The Record Music News From NPR.

*"Our job as journalists is to report, to find facts, and establish their authenticity and share them with everybody," says Oreskes. "**It's really important that people understand that these aren't our opinions.**" - Michael Oreskes (NPR's senior vice president for news until 2017)*

NPR's statement on Accuracy: *"Our purpose is to pursue the truth. Diligent verification is critical. We take great care to ensure that statements of fact in our journalism are both correct and in context. In our reporting, we rigorously challenge both the claims we encounter and the assumptions we bring. We devote our resources and our skills to presenting the fullest version of the truth we can deliver, placing the highest value on information we have gathered and verified ourselves."*

173. **NPR published and broadcasted false defamatory statements describing the plaintiff as a fraud; NPR's publication and broadcast destroyed his reputation, work, career, benefit concerts, spiritual mission, and health after making some of the worst journalistic violations that can be made.**

174. *While some risk of exposure "is a concomitant of life in a civilized community," Time, Inc. v. Hill, 385 U.S. 374 388 (1967), the private citizen does not bargain for defamatory falsehoods. Nor is society powerless to vindicate unfair injury to his reputation. It is a fallacy ... to assume that the First Amendment is the only guidepost in the area of state defamation laws. It is not ...*

*The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being — a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system.* Rosenblatt v. Baer, supra, at 92 (STEWART, J., concurring).

175. In the plaintiff and his wife's websites, the defendants learned that the plaintiff was not just a musician and a filmmaker interested in entertaining, but an artist that was trying to use his talents for humanitarian purposes. On the top of the About page of the plaintiff's site (with his bio) there was a picture of his wife and himself sitting together on a piano in their garden; their mission statement was right on the picture; it has been there since 2006. MISSION STATEMENT **EXHIBIT**

176. There were also several videos clearly showing the meaning and purpose of the plaintiff and his wife's work and mission.

177. One of the videos that was featured on the top of the page was a film trailer (7 minutes long) of the documentary film *The Film That Changed The World,* which won Most Inspirational movie award in 2015, at the Red Dirt International film festival (the video featured two ministers from Wichita, Kansas, whose name and churches were included in the credits. THE FILM THAT CHANGED THE WORLD **EXHIBIT**

178. Another music video featured on their websites was *Wake Up People*, which was written and

produced by the plaintiff and his wife and had been uploaded to YouTube and Vimeo 3 months

prior to NPR's defamatory article and broadcast. *Wake Up People* has a powerful message making

people aware of the suffering and injustice that happens around the world during Christmas time

(when many people are primarily interested in shopping and Christmas parties) and is asking

people to have true empathy and compassion towards others. WAKE UP PEOPLE **EXHIBIT**


179. Another music video that NPR's journalist Andrew Flanagan could have used was *Mindy's*

*Wish*. Mindy is the name of the character performed by the plaintiff's wife in their film *Jesus of*

*Malibu*. The defendants also knew the plaintiff, together with his wife and others, were preparing

a series of benefit concerts to provide wheelchairs to landmine victims. MINDY'S WISH

**EXHIBIT**


180. However, for his story, Andrew Flanagan only used one video which was not even featured

on any of the plaintiff's websites, because it was not something the plaintiff cared about, and it

belonged to someone else; it was a short badly filmed video of the plaintiff playing guitar at a

backyard party when he was only 30 years old. Andrew Flanagan made his readers believe that

was still the plaintiff, at 30 years old, playing guitar, instead of presenting them with the 60 year

old man and his wife and their humanitarian mission. It is obvious why the defendant chose to use

the one video only; all the other videos would have contradicted his story depicting the plaintiff

as an insane loser with no direction or purpose in his life.


181. Because of the article and the radio broadcast (Jacob Ganz stated *"This guy, as good as he*

*might possibly be, is far more interested in infamy than he is in fame and the chase of pulling the*

*wool over people's eyes. He's a huckster. He's a charlatan."),* the owner of the missile base

(where the benefit concerts were going to take place) was extremely disturbed and panicked and

wanted to permanently end the concerts. BENEFIT CONCERTS **EXHIBIT**

*182. "Charlatan"* is defined by Merriam-Webster as a *quack, sham, fraud, fake, impostor, hoaxer, cheat, deceiver, double-dealer, swindler, fraudster, mountebank.* Merriam-Webster's dictionary description of a "Huckster" is: *hawker, peddler; especially : one who sells or advertises something in an aggressive, dishonest way.* These are serious allegations. Evidence shows that words such as "Charlatan" and "Huckster" are in fact used for serious criminals that have been tried by the courts, convicted, and sentenced to prison for a very long time.

183. Examples:

Huckster; Jeffrey Keith "Jeff" Skilling is a former American businessman best known as the CEO of Enron Corporation during the Enron scandal. In 2006, he was convicted of federal felony charges relating to Enron's collapse and, as of 2018, is serving a 14-year prison sentence at FPC Montgomery in Montgomery, Alabama.

184. Huckster: Martin Shkreli was charged in federal court, then convicted on two counts of securities fraud and one count of conspiring to commit securities fraud.[5] He was sentenced to seven years in federal prison and up to $7.4 million in fines.

Charlatan: Art Dealer Eric Spoutz Charged With Selling Dozens of Fakes of American Masters. Quote: Forged documents. He is charged with a single count of wire fraud and could face 20 years in prison if he's convicted.

185. Charlatan: Fake gynecologist described as 'a remorseless charlatan' jailed in Australia. A fake gynecologist who never attended medical school but passed himself off as an infertility expert in Australia for a decade has been sentenced to nine years and six months in prison.

186. Andrew Flanagan openly mocked the crucifixion of Jesus on his Facebook page, stating that he is "LOL" (which means Laughing Out Loud) about the fact that Jesus said he would be raised again. Flanagan also mocked what is known as the sinner's prayer (a prayer used by Billy Graham to save over billions of people across the world) changing the sentence *"Jesus come into my life,"* for *"Jesus I'm a Sinner Please Come Upon my Body and into my Mouth"* ("come" meaning ejaculating). MOCKING CHRIST **EXHIBIT**

187. Would this type of journalist be able to connect to the plaintiff and his wife's spiritual values and mission?

188. Was the video *Wake Up People* offensive to Andrew Flanagan, because the plaintiff and his wife don't believe that Christmas time (the birth of Jesus Christ) has anything to do with spending money? Is that why he chose not to share this video, the most recent video by the plaintiff and his wife, featured in all of their websites (or any of their videos from the past 12 years) and instead chose to only share a video of the plaintiff from 30 years ago jamming at a backyard.

189. In the plaintiff and his wife's websites there were also articles, comments, reviews, information, professional and relevant contacts, an immense amount of facts/evidence that was ignored because it contradicted what NPR was trying to make their audience believe.

190. **Even though the plaintiff only has to prove negligence because he is a private figure, actual malice can be proven too.**

191. **Defamatory claims / Reasons why they are actionable:**

The plaintiff finds over 20 claims that are actionable by law within the article and broadcast. In this original complaint he is going to begin by addressing only few of them.

Claim / Challenged Statements (1), (2), (3), (4) and (5).


**(1)** *"This is the story of a hoax that almost was. Its motivating force was a hunger for fame, or infamy*, or whispered legend in a particularly American sort of way."

**(2)** *"The lightning-fast turnaround on this record-breaking sale*, however, *seems to have been a fiction woven by the record's creator."*

**(3)** *"Now, it seems clear that Yeager has attempted to perpetrate another hoax: He is, it seems, the seller who posted 301 Jackson St. on Discogs. He's also likely the buyer.* Which means that $18,000 never changed hands **and also raises the possibility that the test pressing of 301 Jackson St. does not exist at all."** *(Note: the seller and the buyer of the record album are willing to testify in court and present the record album which NPR also stated, without any proof, may not exist.)*

**(4)** *"Everything about this tale points to Yeager having bought his own unknown record from himself, short of Yeager actually admitting it. But to what end? Likely the one you're reading."*

**(5)** "What comes after this, **Yeager's latest arguable success (however fleetingly, he held a sales record over Prince —** more than most can hope for, at least) **might be a form of infamy that he could, for once, be satisfied with."**


192. In *Milkovich*, Chief Justice Rehnquist wrote for the majority that the statement from *Gertz* was not "*intended to create a wholesale defamation exemption for anything that might be labeled 'opinion'*" since "*expressions of 'opinion' may often imply an assertion of objective fact. [3] Diadiun's column, it found, strongly suggested that Milkovich perjured himself and was not couched hyperbolically, figuratively or in any other way that would mean the writer didn't*

*seriously mean it. "The connotation that petitioner committed perjury is sufficiently factual to be susceptible of being proved true or false,"* the Court concluded.

193. *"Subjective statements and statements of opinion are protected by the First Amendment as long as they do not present or **imply the existence of defamatory facts which are capable of being proven true or false."*** Milkovich v. Lorain Journal Co., 497 U.S. 1,18- 19 (1990).

194. As Judge Friendly aptly stated: *"[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'"*

195. Statements (1), (2), (3), (4) and (5) are five 'statements of fact couched as an opinion,' which assert a matter of objective fact that can be proved true or false.

196. These five 'statements of fact couched as an opinion' are accusing the plaintiff of perpetrating a dishonest activity (a fraudulent sale); the statements were not stated in any way that would mean the journalist didn't seriously mean it; the statements were made in an assertive manner.

197. Not only are these five statements clearly accusing the plaintiff of being the perpetrator of a fraudulent sale, but they are attacking his character and describing him as a dishonest person that is motivated by dishonest and dishonorable motives. Also, there were numerous other statements all throughout the article in which the accusation was implied by the defendants stating the reasons why the fraudulent sale had taken place; again, the defendants attributed it to dishonest and dishonorable motives.

198. Here are some of the defamatory statements which continue to accuse the petitioner and attribute to him dishonest and dishonorable motives:

a) *"The album, called 301 Jackson St., was recorded by Billy Yeager, a Florida man who has **pursued** musical fame (or at least **notoriety**) **for 37 years**, by his own account."*

b) *"**Yeager**, for all the belief he has in his promise and his failures expressing it, **has repeatedly poured more of his creative energy into being a trickster- booster than he has an artist.**"*

c) *"This guy, as good as he might possibly be, is far more **interested in infamy** than he is in fame **and the chase of pulling the wool over people's eyes. He's a huckster. He's a charlatan.**"* (said by Ganz in the broadcast).

d) *"Eventually, Yeager began experimenting with the web and the infinite possibilities it offers, to **those with ample time on their hands**, for **invention, obfuscation** and, most importantly, **self-mythology**."*

e) *"The story of Billy Yeager is one of **purposeless obfuscation**."*

**(Note: Ironically, one of the 2 main disclosed facts on which the false defamatory statements a), b), c), d), and e) are based is the unverified defamatory accusation against the plaintiff of being the perpetrator of a fraudulent sale.)**

199. Although there was no proper investigation conducted, no verification / corroboration done, no talk to relevant sources, no contacting the petitioner, and no reasonable care, but a great violation of the code of rules and the standards of NPR and The Society of American Journalists, statements (1), (2), (3), (4) and (5) were not only published with negligence, but actual malice. Although Discogs stated there was a buyer and a seller located in 2 different states, the defendants purposely omitted this crucial evidence and instead manipulated and misrepresented information from the petitioner's websites, took information out of context, fabricated material, and

republished defamatory information against the petitioner (from over 22 years ago) with actual malice, distorting the truth about the petitioner's character, work, career, and his purpose and mission in life.

**Reasons why the Statements (1), (2), (3), (4) and (5) are actionable**:

200. Factual evidence and sworn testimony from witnesses proves the statements to be false; to have been distributed all over the world; to have injured the plaintiff (discredited him, destroyed his reputation as an honest person and a serious artist, misrepresented his work, his career, diminished the esteem and confidence in which he was held prior to the defamatory article and broadcast, excited adverse, derogatory and unpleasant feelings and opinions against him, and involved the idea of disgrace); to have been published and broadcasted with **negligence** (in violation of the code of rules, ethics and standards of NPR and the American society of journalism); to have been published and broadcasted with **actual malice** (knowledge of falsity or reckless disregard for the truth regarding defamatory information being published or broadcast). **Also, all of the disclosed facts can be proven to be defamatory and made with negligence and actual malice.**

201. **Being a private figure, negligence is the burden of proof (threshold for liability) that the plaintiff has to meet.**

202. **Claim** / Challenged Statement **# 6** : *"This guy, as good as he might possibly be, is far more interested in infamy than he is in fame and the chase of pulling the wool over people's eyes. He's a huckster. He's a charlatan."* (said by Ganz in the broadcast).

203. Reasons Actionable as a Matter of Law: False and defamatory statement. Communicated to millions of people. The defendants acted negligently and with actual malice when publishing it. The plaintiff was damaged as a result. The disclosed facts on which the statement was based are false/defamatory and were published with negligence and with actual malice.

204. **Claim** / Challenged Statement **# 7**: *"Yeager, for all the belief he has in his promise and his failures expressing it, **has repeatedly poured more of his creative energy into being a trickster-booster than he has an artist."***

205. The statement is actionable as a matter of law because it is false and defamatory. It was communicated to millions of people. The defendants acted negligently and with actual malice when publishing it. The plaintiff was damaged as a result. The disclosed facts on which the statement was based are false/defamatory and were published with negligence and with actual malice.

206. **Claim** / Challenged Statement **# 8**: *"**The story of Billy Yeager is one of purposeless obfuscation."***

207. This statement concluded NPR's news article. The statement is actionable because it is false and defamatory. It was communicated to millions of people. The defendants acted negligently and with actual malice when publishing it. The plaintiff was damaged as a result. The disclosed facts on which the statement was based are false/defamatory and were published with negligence and with actual malice.

208. *"A statement is defamatory if it diminishes the esteem, respect, goodwill or confidence in*

*which the plaintiff is held or excites adverse, derogatory or unpleasant feelings or opinions against him. A defamatory statement necessarily involves the idea of disgrace."* Clark, 242 F.Supp.3d at 1217.

209. All of these statements are obviously defamatory, but also highly offensive, because they are clearly describing the plaintiff as a corrupt person, with no integrity, having a willingness to act dishonestly for money or personal gain.

210. These statements severely damage the petitioner's reputation, work and health. The plaintiff is still on 2 medications (for severe depression and PTSD) and continues to visit a mental health doctor. All comments made by NPR's audience prove that the result of the news article was not a debate about the official news that were reported by Discogs (because the news article was not written in good faith), but a direct attack on the petitioner's character, work and career.

211. NPR discredited the plaintiff, dishonored him, humiliated him, exposed him to hatred, ridicule, contempt, and caused him to be shunned.

**CLAIMING FALSE LIGHT**

212. A false light privacy action requires that publicity be given to someone which places that person before the public in a false light of a kind highly offensive to a reasonable person.1 Hunter v. The Buckle, Inc., 488 F.Supp.2d 1157, 1179 (D.Kan. 2007)(citing Rinsley v. Frydman, 559 P.2d 334, 339 (Kan. 1977)).

213. Which reasonable artist could state he would not find it highly offensive being accused of

having spent more time in his life creating dishonest schemes for no purpose other than fame and infamy than working on his art?

214. If **dishonest** means unworthy of trust or belief; if **dishonest** implies a willful perversion of truth in order to deceive, cheat, or defraud; if **dishonest** usually implies an intent to mislead; if the plaintiff and his wife's main desire and purpose in life is seeking truth and leading people to truth and using their work to help those that are suffering; how could any reasonable person consider that being accused of having spent more time being a dishonest person does not bring the plaintiff disgrace, when disgrace means loss of reputation or respect, especially as the result of a dishonorable action? The plaintiff's reputation previous to the broadcast and article by NPR was not that of a dishonest person. Factual evidence proves that the defendants knew this.

A sample of comments made by people about the plaintiff's work: **EXHIBIT**
A sample of comments made to NPR story: **EXHIBIT**

215. Should the plaintiff have to remain for the rest of his life being labeled as something opposite to what he is; not being able to pursue his dream and use his talents to help others due to the negligence and malice of NPR? That would be Unjust and terribly wrong. The defendants know this and this Court knows this.

216. Plaintiff will prove False light, proving the following elements:
  1.   The Defendant published some information about the Plaintiff.
  2.   The information portrayed the Plaintiff in a false or misleading light.
  3.   The information is highly offensive or embarrassing to a reasonable person of ordinary sensibilities.

4. The Defendant published the information with reckless disregard as to its offensiveness. Evidence not only proves that NPR's article and broadcast misled the audience, but that the defendants acted with negligence and actual malice.

217. The plaintiff's website contained articles, comments, dozens of relevant contacts (people that have worked with the plaintiff and heard/watched his work), film reviews, music videos and film trailers each testifying of the plaintiff's true mission and purpose in life. Andrew Flanagan and Jacob Ganz ignored these facts of evidence, and chose instead to depict the plaintiff as nothing more than a fraud and a failure, with no purpose or meaning in life other than seeking attention because he is pathetically obsessed with obtaining fame and infamy.

**CLICK HERE TO SEE EXHIBIT**

218. The defendants also refused to watch the 1 hour and 40 min feature documentary film about the plaintiff (or contact any of the people who had watched it and had left a comment) even though the defendants knew that the documentary had samples of plaintiff's work as a musician and filmmaker.

**Samples of False Light claims:**

219. *"The album, called 301 Jackson St., was recorded by Billy Yeager, a Florida man who has* ***pursued*** *musical fame (or at least* ***notoriety)*** *for 37 years, by his own account."*

*"In 1990, the story goes, Hornsby heard a demo tape of Yeager's, liked what he heard and connected Yeager with Capitol Records, who gave Yeager a shot. It was the closest he would come to fame, but* ***it cemented in Yeager's mind what he'd thought for some time: that he was destined for, perhaps owed, greatness."***

"*Eventually, Yeager began experimenting with the web and the infinite possibilities it offers, to* **those with ample time on their hands**, *for* **invention, obfuscation** *and, most importantly,* **self-mythology**."

"*Instead,* **Yeager created a murkier —** *possibly* **entirely fictional — network of identities with the purpose of propping himself up,** *like stilts under a sun-worn beach house.* **This network appears to be composed of publicists, managers, film producers and retailers of Yeager memorabilia —** *or what normal folks call items of sentimental value.*"

"**Yeager**, *for all the belief he has in his promise and his failures expressing it,* **has repeatedly poured more of his creative energy into being a trickster- booster than he has an artist.**"
"*What comes after this,* **Yeager's latest arguable success (however fleetingly, he held a sales record over Prince —** *more than most can hope for, at least)* **might be a form of infamy that he could, for once, be satisfied with.**"

**ACTUAL MALICE**

220. **The plaintiff has shown evidence and precedent prove that the plaintiff is a private figure and only needs to prove negligence instead of actual malice. Nevertheless the plaintiff can prove that the defendants exercised actual malice too.**

221. Actual malice is the publication of a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

222. The plaintiff can prove the crucial omissions (of information and factual evidence) that were made by the defendants; the plaintiff can prove that the defendants willfully ignored evidence (videos, information/facts, articles, witnesses testimony and comments) that contradicted their story.

223. In *Harte Hanks v. Connaugthon*, the U.S. Supreme Court ruled that the purposeful failure to interview a person with an opposing viewpoint can be evidence of actual malice. If it appears that the reporter is trying to "build a case" and is intentionally avoiding any information that would be contrary to the point he is trying to make, such an approach may be view as evidence of actual malice.

224. Also, the plaintiff can prove that the disclosed facts to support the defendants' opinion were false, defamatory, and were published with negligence and actual malice; information was purposely misrepresented and the truth distorted; information was made up; and the defendants purposely republished defamatory information that they knew was false or with reckless disregard for the truth.

225. One of the statements the plaintiff will address to show to this court the existence of actual malice is: *"The story of Billy Yeager is one of purposeless obfuscation"* . This statement bookends the entire message of the whole story Flanagan was trying to convey to his audience, to which readers commented the plaintiff was a schizophrenic, crook, con artist, scammer; the plaintiff was even compared to Charles Manson.

226. 'Jimmy Story' is the main disclosed fact journalist Andrew Flanagan used as the basis of most of his defamatory statements such as *"The story of Billy Yeager is one of purposeless*

*obfuscation"*, but he was simply being deceptive calling it a *"hoax"* made by an *"embittered"* man, *"Dyeing his skin for years…"*.


227. ( Examples of what NPR published:

*1 "In 1990, the story goes, Hornsby heard a demo tape of Yeager's, liked what he heard and connected Yeager with Capitol Records, who gave Yeager a shot. It was the closest he would come to fame, but **it cemented in Yeager's mind what he'd thought for some time: that he was destined for, perhaps owed, greatness."***


*2 **"Embittered, Yeager began to plan the Jimmy Story bamboozle."***


*3 **"The most eccentric — and ill-conceived — example of his promotional facility, bar none, came when Yeager spent two years planning and executing a hoax that would eventually convince a television station and a weekly paper to believe that he was Jimmy Story, the son of Jimi Hendrix, who was in possession of lost recordings from the psychedelic legend. To pull off the scam, Yeager dyed his skin brown."***

*4 **"Yeager had assembled, roughshod and chaotic, a documentary about his life, with the Jimmy Story hoax as its centrifugal force."***


228. (Note: Factual evidence and firsthand testimony evidence prove that the 4 statements above are false and defamatory and present the plaintiff and his work in false light. The defendants acted negligently and with actual malice when publishing this information. The plaintiff and his work were damaged as a result. The disclosed facts on which the statements were based are false/ defamatory and were published/republished with negligence and with actual malice.)

229. The plaintiff's first feature film (fictional film) *Jimmy's Story* was purposely misrepresented by the defendants; information from the petitioner's websites was manipulated (also information was fabricated) to create a sensational story that had the potential to be spread all over the world.

230. The entire life's work of the plaintiff is built upon a spiritual basis. The very first poster that was produced and printed of the film *Jimmy's Story* clearly states, "*To everything there is a season and purpose under heaven,*" from the book of Ecclesiastes.

231. Jimmy Story is a fictional character in the movie *Jimmy's Story*, in which a musician ponders the meaning of life. The film is not about the life of Billy Yeager, but the story of Jimmy Story. The plaintiff played the role of Jimmy Story. The film took the plaintiff over 23 years to produce, and received 5 awards at the Dahlonega Film Festival and the Palm Beach International Film Festival where it premiered. **EXHIBIT**

232. The defendants knew this, because this information has been stated on the plaintiff's websites for over 20 years, but they ignored all these facts and instead chose to republish information from over 22 years ago with negligence and actual malice, misrepresent information and distort the truth (they also fabricated pieces of information), making their audience believe Jimmy Story was a real "hoax" that the plaintiff had done because, after being continuously "stymied" (a life of "failures" and "rejections"), he became so "embittered" and "obsessed" he dyed his skin brown to try to fool the world he was the son of Jimi Hendrix for "fame" and "infamy", and since then that is what he has spent most of his life doing, being a "trickster," motivated by an "interest in infamy and pulling wool over people's eyes," and therefor his life, NPR's concludes to his audience, is "purposeless."

233. The plaintiff and his wife's websites also contained articles, music videos, film reviews, awards info and pictures, dozens of extremely professional people that the plaintiff has worked with throughout his 40 year career that could have been contacted by the defendants, but they chose to ignore EVERYTHING.

**CLICK HERE TO SEE EXHIBIT**

234. The defendants knew what the plaintiff's work was about, and what his mission and purpose were. The defendants knew that the plaintiff and his wife were spiritual artists wanting to challenge and inspire people to seek truth and to help those suffering.

235. When the plaintiff provided NPR's senior legal counsel Ashley Messenger with the same information/facts that were on his website, the same information that had been available to the defendants, Messenger showed these to members from NPR's corporate team and board of directors. After seeing these facts/information, they asked the plaintiff to write about his desire to change the world, his artistic vision, his high ideals, the meaning of his performances, which IS an admission that the plaintiff's life is not one of purposeless obfuscation, but one of high purpose with a clear mission, motivated, not by "fame and infamy," but high ideals.

**PRAYER OF RELIEF**

236. As a direct and proximate result of the many false accusations and false light by NPR, the plaintiff has suffered damages, including, *inter alia*, injury to his reputation and work, loss of employment and income, embarrassment, humiliation, major depression and emotional distress and injury.  The permanent damage caused to his reputation must all be taken into account when awarding damages in an amount to be determined at trial.

237. The court should consider not only what the Plaintiff should receive, but also what the Defendants should pay as punitive damages.

238. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment, jointly and severally, against Defendants, awarding Plaintiff punitive damages to punish and deter Defendants in an amount not less than $250 Million ($ 250,000,000.00) and granting such other and further legal or equitable relief deemed appropriate.

239. NOTE On Punitive Damages: Punitive damages are damages assessed in order to punish the defendant for outrageous conduct and/or to reform or deter the defendant and others from engaging in conduct similar to that which formed the basis of the lawsuit. The Court needs to consider the amount being requested above, it may sound to some as excessive, however, one must consider the 445 million dollars that is provided every year of American citizen tax dollars to the CPB Corporation of Public Broadcasting; these funds are distributed between NPR and PBS.

240. This year appropriations increased funding to the Corporation of Public Broadcasting over 50 million dollars.

**CERTIFICATION AND CLOSING**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Plaintiff demands a trial by jury on all issues in this case.

Respectfully submitted.

S/ William Yeager

206 Cottonwood Falls, KS. 66845